CORBETT v ALLSTATE INSURANCE COMPANY

1. INSURANCE—AUTOMOBILES—REPLACEMENT VEHICLE—FACTORS.

Factors to be considered in determining whether a newly acquired vehicle is a replacement vehicle and replaces a vehicle described in an automobile insurance policy as the vehicle covered by the policy are (1) title to the respective vehicles, (2) the effect of continued possession and the condition of the original vehicle, and (3) the kind of intended use and the actual use of the new vehicle.

2. INSURANCE—AUTOMOBILES—NEWLY-ACQUIRED VEHICLE—POSSESSION OF TWO VEHICLES—REPLACEMENT.

For a replacement of automobiles covered by an insurance policy to occur where an insured has two vehicles in his possession, one the vehicle described in the policy and the other a newly-acquired vehicle, the newly-acquired vehicle must take the place of the described vehicle and the described vehicle must be treated in such a manner that it becomes clearly apparent that it has been replaced by the newly-acquired vehicle and is no longer covered by the insurance policy.

Appeal from Wayne, Nathan J. Kaufman, J. Submitted March 13, 1975, at Detroit. (Docket No. 20260.) Decided July 21, 1975. Leave to appeal applied for.

Complaint by Donald L. Corbett, Frank Stockdale and Dorothy Stockdale, against Allstate Insurance Company, Western Casualty and Surety Company, Riverside Insurance Company and Farm Bureau Insurance Group for a declaratory judgment to ascertain which of defendant insurance companies owed coverage for an automobile accident. Judgment for defendants Allstate Insurance

REFERENCE FOR POINTS IN HEADNOTES

[1, 2] 7 Am Jur 2d, Automobile Insurance §§ 72, 100, 101.

Company, Western Casualty and Surety Company, and Riverside Insurance Company. Defendant Farm Bureau Insurance Group appeals. Reversed.

*Harvey, Kruse & Westen, P. C.,* for defendant Farm Bureau Insurance Group.

*Garan, Lucow, Miller, Lehman, Seward & Cooper, P. C.,* for defendant Allstate Insurance Company.

*Alexander, Buchanan & Seavitt* (by *Thomas D. Beeby),* for defendant Western Casualty and Surety Company.

Before: R. B. Burns, P. J., and T. M. Burns and R. M. Maher, JJ.

R. M. Maher, J. Plaintiff, Frank Stockdale, was the owner-operator of an automobile which was involved in a collision with an automobile driven by Wayne T. Jameson on November 9, 1969. Dorothy Stockdale and Donald L. Corbett were passengers in the Stockdale auto. Plaintiffs brought an action for declaratory judgment to ascertain which of defendant insurance companies owed coverage for the accident. On January 25, 1974, the trial court heard arguments on three motions for summary judgment brought by defendant insurance companies, Western Casualty and Surety Company, Allstate Insurance Company, and Farm Bureau Insurance Group. In their motions for summary judgment, defendants Western Casualty and Surety Company and Allstate Insurance Company claimed that Jameson was operating an insured automobile, as defined in his policy, and that they did not owe uninsured motorist coverage to plaintiffs. Defendant Farm Bureau Insurance Group

argued that the 1960 Chevrolet automobile, owned and operated by Jameson at the time of the accident, was not covered by the automobile liability policy issued to him since it did not fall within the definition of an "owned automobile". The trial judge ruled that the 1960 Chevrolet automobile was in fact an "owned automobile" inasmuch as it fell into the classification of a "replacement vehicle" within the meaning of the policy issued to Jameson by Farm Bureau Insurance Group and ordered Farm Bureau to provide insurance coverage. Western Casualty and Allstate's motions for summary judgment were granted and Farm Bureau appeals.

The facts are not in dispute. Farm Bureau Insurance Group did have in force and effect on November 9, 1969, a policy of automobile liability insurance in which Wayne T. Jameson was the named insured. The policy was written on a 1959 Chevrolet pickup truck and afforded liability coverage in the amount of 10,000 to 20,000 dollars. Jameson also owned at this time the 1960 Chevrolet automobile which was involved in the accident in question. Jameson had purchased the automobile on November 7, 1969 for $25. He had received a notarized transfer of title and had equipped the vehicle with license plates acquired at a local dump. The 1959 pickup truck, named in the policy, had been used to haul tools. However, when Jameson purchased the 1960 Chevrolet passenger vehicle, the truck was inoperable. Jameson's stated purpose in purchasing the 1960 Chevrolet passenger vehicle was to transfer the engine to the 1959 Chevrolet pickup truck, but from the time of its purchase on November 7, 1969 until the date of the accident, 2 days later, Jameson used the 1960 Chevrolet passenger vehicle to haul tools in place

of the 1959 pickup truck. Subsequent to the accident, Jameson did transfer the engine from the car to the truck. He also testified that if any other vehicle had been available on November 9, he would not have driven the 1960 Chevrolet automobile.

The question on appeal is whether this second vehicle, purchased so that its engine could be transferred to the inoperable vehicle described in the policy of insurance, was a "replacement vehicle" during the time it was being used instead of the described vehicle. The Farm Bureau policy issued to Jameson afforded him coverage, if, at the time of the loss, he was operating an "owned automobile", "a temporary substitute automobile", or a "non-owned automobile". The pertinent terms are defined as follows, beginning with the definition of an "owned automobile":

"(a) a private passenger, farm or utility automobile described in this policy for which a specific premium charge indicates that coverage is afforded,

"(b) a trailer owned by the named insured,

"(c) a private passenger, farm or utility automobile ownership of which is acquired by the named insured during the policy period, provided

"(1) *it replaces an owned automobile as defined in (a) above,* or the company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and,

"(2) the named insured notifies the company within thirty (30) days after the date of said acquisition of his election to make this and no other policy issued by the company applicable to said automobile or,

"(d) a temporary substitute automobile;

" 'temporary substitute automobile' means any automobile or trailer, not owned by the named insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or

trailer when withdrawn from normal use because of its breakdown, repair, loss or destruction;

" 'non-owned automobile' means an automobile or trailer not owned by or furnished for the regular use of either named insured or any relative other than a temporary substitute automobile." (Emphasis supplied.)

At the time of the accident, Mr. Jameson was driving the 1960 Chevrolet passenger automobile which he had purchased two days earlier. The vehicle was not a "temporary substitute" or a "non-owned automobile" within the definition of the policy because Jameson held title to the car and the policy definition required that the vehicle be owned by someone other than the named insured if the vehicle is to qualify under those provisions. Additionally, the automatic fleet coverage was not available to Jameson because he owned a 1963 Dodge which was not insured by Farm Bureau.

A clear case of "replacement" would occur when disposition has been made of an old vehicle described in the policy and a new vehicle of equivalent use is substituted. Where ownership of the old vehicle is temporarily retained, however, the result is not always so clear. The case of *Beck Motors, Inc v Federal Mutual Insurance Co,* 443 SW2d 200, 203 (St Louis Ct of App, Mo, 1969), provides an excellent survey of the law pertaining to replacement vehicles and states that the most commonly accepted definition of what constitutes a replacement vehicle is the one found in *State Farm Mutual Automobile Ins Co v Shaffer,* 250 NC 45, 52; 108 SE2d 49, 54 (1959):

"It is our opinion that the replacement vehicle is one the ownership of which has been acquired after the issuance of the policy and during the policy period, and

it must replace the car described in the policy, which must be disposed of or be incapable of further service at the time of the replacement."

*Beck, supra,* 203–204, goes on to explain:

"Following this definition the courts generally require that the replaced automobile either be actually disposed of by transfer of ownership contemporaneously with acquisition of the replacement or be incapable of operation at that time and at anytime thereafter while owned by the insured. (Citations omitted.)

"There is authority which modifies the stringent requirements of this definition somewhat. The relaxation of this rule found in some of the cases seems to have its genesis in *Merchants Mut Casualty Co v Lambert,* 90 NH 507; 11 A2d 361; 127 ALR 483, where no disposition had been made of the listed vehicle and it was legally operable, in the sense that it was registered and could therefore be operated under the state law on the highways of the state. In fact, the listed vehicle was unserviceable, and remained in the insured's garage at all times after acquisition of the replacement vehicle. The court held the second vehicle to have replaced the listed vehicle within the meaning of the policy. The decision is based in part upon the court's conclusion that the second car was acquired with the intent that it replace the listed automobile and its use was in keeping with that intent. Thereafter, some decisions which in their language seem to modify the disposal or inoperable requirement of *Shaffer* appeared, based predominately upon the intent to replace theory of *Lambert.*"

Nevertheless:

"Under either line of cases the policy provision is not intended or interpreted to provide coverage for an additional vehicle. To so interpret would allow coverage on two vehicles for the premium on one. It is not necessary for us to determine the precise limits at which a vehicle becomes 'additional' rather than 're-placement.' But without setting hard and fast rules, *it*

*is necessary, in order for the provision to apply, that the newly-acquired vehicle take the place of the described car and the described car be treated thereafter in such fashion that it is clearly apparent it has been replaced and is no longer covered by the policy.* Notification to the company of a replacement, of course, is such treatment and clearly establishes what vehicle is covered. Disposition of the vehicle, or *its being and remaining in an inoperable condition also presents concrete evidence of the change of coverage.* There may be other possibilities of treatment which would establish that the vehicle has been replaced. But the insurance company may not be held except upon a clear showing of replacement, nor in a circumstance where the insured could show that either car was covered, depending on which one was involved in the accident." 443 SW2d at 204–205. (Emphasis supplied.)

Western Casualty and Allstate argue that our only concern is with the risk to the insurer and that under the facts in this case, at no time could there have been coverage on two vehicles for the premium on one since the 1959 pickup could not run without the 1960 Chevrolet engine. However, we do not agree that the lack of two risks is the sole consideration for our decision and that the lack of two risks, when a second vehicle is acquired, automatically designates that vehicle a "replacement".

Whether a newly acquired vehicle replaces the originally covered vehicle involves the consideration of several factors such as: "title to the respective [vehicles]; the effect of continued possession and the condition of the original [vehicle]; the kind of intended use and the actual use of the new [vehicle]". 12 Couch, Insurance, 2d ed, § 45:209, p 254. (Footnotes omitted.) Furthermore, we must keep in mind what is meant by "replacement":

" 'Replace' as defined in 2 *Shorter Oxford English*

*Dictionary (3rd ed* Reprint 1947), 1706 is: '3. * * * b. To provide or produce a substitute or equivalent in place of (a person or thing) * * * . '*Nationwide Mutual Ins Co v Mast,* 2 Storey 127; 153 A2d 893 (Del Super Ct 1959), *Continental Casualty Co v Employers Mutual Casualty Co,* 198 Kan 93; 422 P2d 560 (Sup Ct 1967).

"*Websters New International Dictionary (2d ed)* defines 'replacement' as follows:

" ' "Replace" means "To take the place of; to serve as a substitute for, or successor of; supplant; * * *. To fill the place of; to supply an equivalent for; * * * ." ' " *Wojciechowski v Hardware Mutual Casualty Co,* 105 NJ Super 144, 147; 251 A2d 316, 318 (1969).

For "replacement" to occur when an insured has two vehicles in his possession, the newly acquired vehicle must take the place of the described vehicle and the described vehicle must be treated in such a manner that it becomes clearly apparent that it has been replaced by the newly acquired vehicle and is *no longer* covered by the insurance policy. Such is not the case here. In the present case, Jameson never intended the 1960 Chevrolet to be a "replacement" for the 1959 pickup.

Jameson's deposition testimony reveals that his "purpose or intention in purchasing the 1960 Chevrolet automobile" was "to put the engine into the pickup" and Jameson's subsequent actions confirmed his stated intention. He retained title, possession and control of the 1959 pickup. The 1960 passenger vehicle was equipped with license plates from a local dump, not plates transferred from the truck. The truck remained legally operable at all times and was made mechanically operable upon transfer of the engine from the 1960 Chevrolet. The 1960 Chevrolet did not "replace" the 1959 pickup truck.

The order for summary judgment of dismissal as to Allstate Insurance Company and Western Casualty and Surety Company is reversed with costs to appellant, Farm Bureau Insurance Group.